PUBLISH

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
# Judge Robert E. Blackburn

Civil Action No. 13-cv-01864-REB

SANDRA GONZALES,

    Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

    Defendant.

## ORDER REVERSING DISABILITY
## DECISION AND REMANDING TO COMMISSIONER

**Blackburn, J.**

The matter before me is plaintiff's **Complaint** [#1],[1] filed July 12, 2013, seeking review of the Commissioner's decision denying plaintiff's claim for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 401, *et seq.* I have jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 405(g). The matter has been fully briefed, obviating the need for oral argument. I reverse and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff alleges that she is disabled as a result of bipolar disorder, depression, anxiety, panic attacks, agoraphobia, a seizure disorder, ulcers, and pain in her back,

---

[1] "[#1]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

shoulders, and neck following two car accidents and a cervical spinal fusion. After her application for supplemental security income benefits was denied, plaintiff requested a hearing before an administrative law judge. This hearing was held on February 28, 2012. At the time of the hearing, plaintiff was 48 years old. She attended three years of college and has past work experience as an administrative assistant, assistant manager, telemarketer, and waitress. Although plaintiff works part-time at a video store in her small, rural Colorado hometown, this work does not rise to the level of substantial gainful activity, and she has not engaged in substantial gainful activity since at least January 28, 2010, the date of her application for benefits.

The ALJ found that plaintiff was not disabled and therefore not entitled to supplemental security income benefits. Although the medical evidence established that plaintiff suffered from severe physical and mental impairments,[2] the ALJ concluded that the severity of those impairments did not meet or equal any impairment listed in the social security regulations. The ALJ found that plaintiff had the residual functional capacity to perform a range of light work with postural and non-exertional limitations. Although this finding precluded plaintiff's past relevant work, the ALJ concluded that there were jobs existing in significant numbers in the national and local economies that she could perform. He therefore found plaintiff not disabled at step five of the sequential evaluation. Plaintiff appealed this decision to the Appeals Council. The Council affirmed. Plaintiff then filed this action in federal court.

---

[2] Specifically, the ALJ found that severe degenerative disc disease of the spine status post C3-C4 posterior fusion, partial rotator cuff tear, obesity, mixed bipolar disorder with psychotic features, PTSD, and an unspecified pain disorder, constituted severe impairments. (Tr. 27.) The remainder of plaintiff's alleged impairments were found to be not severe at step 2 of the sequential analysis. (Tr. 28-31.)

## II.  STANDARD OF REVIEW

A person is disabled within the meaning of the Social Security Act only if her physical and/or mental impairments preclude her from performing both her previous work and any other "substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2).  "When a claimant has one or more severe impairments the Social Security [Act] requires the [Commissioner] to consider the combined effects of the impairments in making a disability determination."  **Campbell v. Bowen**, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing 42 U.S.C. § 423(d)(2)(C)).   However, the mere existence of a severe impairment or combination of impairments does not require a finding that an individual is disabled within the meaning of the Social Security Act.  To be disabling, the claimant's condition must be so functionally limiting as to preclude any substantial gainful activity for at least twelve consecutive months.  *See Kelley v. Chater,* 62 F.3d 335, 338 (10th Cir. 1995).

The Commissioner has established a five-step sequential evaluation process for determining whether a claimant is disabled:

>   1. The ALJ must first ascertain whether the claimant is engaged in substantial gainful activity. A claimant who is working is not disabled regardless of the medical findings.
>
>   2. The ALJ  must then determine whether the claimed impairment is "severe."  A "severe impairment" must significantly limit the claimant's physical or mental ability to do basic work activities.
>
>   3. The ALJ must then determine if the impairment meets or equals in severity certain impairments described in Appendix 1 of the regulations.

>    4.   If the claimant's impairment does not meet or equal a listed impairment, the ALJ must determine whether the claimant can perform his past work despite any limitations.
>
>    5.   If the claimant does not have the residual functional capacity to perform her past work, the ALJ must decide whether the claimant can perform any other gainful and substantial work in the economy. This determination is made on the basis of the claimant's age, education, work experience, and residual functional capacity.

20 C.F.R. §§ 416.920(a)(4) & (b)-(g). **See also Williams v. Bowen** 844 F.2d 748, 750-52 (10th Cir. 1988). The claimant has the initial burden of establishing a disability in the first four steps of this analysis. **Bowen v. Yuckert**, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5, 96 L.Ed.2d 119 (1987). The burden then shifts to the Commissioner to show that the claimant is capable of performing work in the national economy. **Id.** A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. **Casias v. Secretary of Health & Human Services**, 933 F.2d 799, 801 (10th Cir. 1991).

Review of the Commissioner's disability decision is limited to determining whether the ALJ applied the correct legal standard and whether the decision is supported by substantial evidence. **Hamilton v. Secretary of Health and Human Services**, 961 F.2d 1495, 1497-98 (10th Cir. 1992); **Brown v. Sullivan**, 912 F.2d 1194, 1196 (10th Cir. 1990). Substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion. **Brown**, 912 F.2d at 1196. It requires more than a scintilla but less than a preponderance of the evidence. **Hedstrom v. Sullivan**, 783 F.Supp. 553, 556 (D. Colo. 1992). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."

***Musgrave v. Sullivan***, 966 F.2d 1371, 1374 (10th Cir. 1992). Further, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." ***Thompson v. Sullivan***, 987 F.2d 1482, 1487 (10th Cir. 1993). Although a reviewing court should meticulously examine the record, it may not reweigh the evidence or substitute its discretion for that of the Commissioner. ***Id.***

### III.  LEGAL ANALYSIS

Plaintiff opens her appeal by suggesting that the ALJ erred at step 3 of the sequential evaluation by failing to obtain an updated opinion on medical equivalence. This argument is not supported by the record.[3] Nevertheless, I agree that the ALJ gave insufficient reasons for the weight assigned to the medical opinions of record and for discrediting plaintiff's subjective complaints, and therefore remand.

From at least 2009 onward, plaintiff received treatment for her various physical complaints at the Guadalupe Health Clinic from Ted Morrison, PA-C. In January 2012, Mr. Morrison issued an opinion stating that plaintiff could sit, stand, and walk for up to

---

[3] "While the ALJ is responsible for deciding the ultimate legal question of whether a listing is met or equaled, the ALJ must receive state agency doctors' judgments on the issue of medical equivalence into the record as expert opinion evidence." ***Carbajal v. Astrue***, 2011 WL 2600984 at *2 (D. Colo. June 29, 2011) (citation and internal quotation marks omitted). *See also* **Social Security Ruling** 96-6p, 1996 WL 374180 at *3 (SSA July 2, 1996). The requirement that medical equivalence be established by the opinion of a medical expert is satisfied, *inter alia*, by the signature of a State agency medical or psychological consultant on a Psychiatric Review Technique Form, such that completed by Dr. James F. Dyde in this case. (*See* Tr. 96-97.) **Social Security Ruling**, 96-6p, 1996 WL 374180 at *3. Although plaintiff insists that an updated opinion was required because the record contained additional medical evidence that might have changed Dr. Dyde's findings that plaintiff's mental impairments were not equivalent in severity to any listed impairment, I disagree. The Commissioner's guidelines do not *require* the ALJ to obtain an updated medical opinion in these circumstances, but rather give him discretion to determine whether, *in his own opinion*, an updated opinion is necessary. *See* **Social Security Ruling**, 96-6p, 1996 WL 374180 at *3-4. The ALJ expressly considered evidence post-dating Dr. Dyde's assessment, but found that it failed to describe limitations in the paragraph B functional areas greater than those found by Dr. Dyde. The ALJ therefore was well within his discretion to determine, at least implicitly, that the evidence was unlikely to change the state agency consultant's medical opinion. *See* ***McCaffrey v. Astrue***, 2011 WL 4536980 at *5 (D. Colo. Sept. 30, 2011).

four hours a day, but could lift only 2 to 5 pounds, could use her left hand only occasionally, would need to lie down periodically throughout the day, and would be absent from work more than 2 days per month due to pain.  (Tr. 399.)  The ALJ gave little weight to this opinion, noting that Mr. Morrison was not an acceptable medical source and concluding that the limitations he endorsed were not supported by his own treatment notes or the medical evidence.[4]  Although the first of these reasons is accurate, it is not alone sufficient to justify rejection of Mr. Morrison's opinion.  Moreover, the remainder of the ALJ's reasons for the weight assigned the opinion do not bear up under scrutiny.

Although the opinion of a treating source is generally entitled to controlling weight, 20 C.F.R. § 416.927(c)(2); **see also Watkins v. Barnhart**, 350 F.3d 1297, 1300 (10th Cir. 2003), Mr. Morrison, a physicians assistant, is not considered an "acceptable medical source," **see Social Security Ruling** 06-03p, 2006 WL 2329939 at *1 (SSA Aug. 9, 2006).  As such, he can neither issue medical opinions, **see** 20 C.F.R. § 404.927(a)(2), nor be considered a treating source whose opinion must be evaluated to determine whether it is entitled to controlling weight, **see** 20 C.F.R. § 404.913(a).  **See also Social Security Ruling** 06-03p, 2006 WL 2329939 at *2; **Frantz v. Astrue**, 509 F.3d 1299, 1301 (10th Cir. 2007).  Nevertheless, the opinions of "other" medical sources

---

[4] There is also the intimation in the ALJ's opinion that Mr. Morrison's opinion was suspect because it had been solicited by plaintiff in support of her application for benefits.  (Tr. 36 (noting that "Mr. Morrison did not offer his opinion until after the claimant asked him to support her application for Medicaid and Medicare").)  The fact that an opinion has been solicited to aid a claimant in supporting her claim for benefits provides no basis for discrediting an otherwise well-supported source opinion, however.  **See Hinton v. Massanari**, 13 Fed. Appx. 819, 824 (10th Cir. 2001).  **See also McGoffin v. Barnhart**, 288 F.3d 1248, 1253 (10th Cir. 2002) (observation that doctor naturally advocates for his patients not legitimate grounds for discrediting medical opinion).

6

such as Mr. Morrison still must be considered and addressed, applying the same factors as are generally used to assess treating source opinions. **Social Security Ruling** 06-03p, 2006 WL 2329939 at *4 (SSA Aug. 9, 2006);[5] 20 C.F.R. §§ 416.913(d) & 416.927(c).

Among these relevant considerations are the length of the treatment relationship and the frequency of examination. 20 C.F.R. § 416.927(c)(2)(i). Here, the ALJ claimed that Mr. Morrison did "not see the claimant with the frequency necessary in order to obtain an in-depth and detailed picture of the 'longitudinal' course of her impairments." (Tr. 36.) Given that the ALJ gave significant weight to the opinions of a consultative examiner, who saw plaintiff but a single time, and a state agency physician, who merely reviewed medical records, this reason is no reason at all. ***See Davis v. Astrue***, 2010 WL 3835828 at *4 (D. Colo. Sept. 23, 2010). Moreover, it is belied by the record. Mr. Morrison saw plaintiff on an average of once every month or two from 2009 until at least March 2011 (Tr. 357-376, 424-432), and then about every 3 to 4 months thereafter (Tr. 405-423). In the absence of any indication that the nature of this plaintiff's treatment was inconsistent with this frequency of visits to her healthcare provider, any negative inference from this factor is insupportable. ***See*** 20 C.F.R. § 416.902; ***see also Doyal v.***

---

[5] This ruling recognizes that, given the realities of modern-day managed healthcare,

> medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

7

***Barnhart***, 331 F.3d 758, 764 (10th Cir. 2003).

The ALJ stated further that Mr. Morrison's opinion was inconsistent with his own treatment notes. However, the only specific instance he gave in support of this conclusion was the observation that, on the day Mr. Morrison completed the residual functional capacity assessment, "claimant did not exhibit *any* physical . . . deficits[.]" (Tr. 36 (emphasis in original).) This construction of the record is largely, albeit not entirely, true. (***See*** Tr. 411 (noting "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection," but also tenderness with motion in both the cervical and lumbar spine).) However, where Mr. Morrison had treated plaintiff for three years at the time he rendered his opinion, citation to a single, unremarkable examination does not warrant the broad conclusion drawn here. A more thorough analysis of the Mr. Morrison's treatment records as a whole was required, and indeed, would have provided the longitudinal picture of plaintiff's symptoms the ALJ claimed Mr. Morrison lacked.

Finally, the ALJ discredited Mr. Morrison's opinion as being inconsistent with the opinion of the consultative examiner, Dr. Adam Summerlin. This purported reason is merely a conclusion, not a finding. ***See Hardman v. Barnhart***, 362 F.3d 676, 679 (10th Cir. 2004). The fact of such a conflict is what gives rise to the need for the ALJ to weigh the opinions in the first instance. The ALJ was required to explain *why* Dr. Summerlin's opinion was entitled to more weight than Mr. Morrison's opinion.[6] ***See Hamlin v. Barnhart***, 365 F.3d 1208, 1215 (10th Cir. 2004). Because the reasons he gave for

---

[6] Moreover, an ALJ may not adopt one medical source opinion by default simply because he discredits or rejects another. ***See Twarog v. Astrue***, 2009 WL 77476 at *4 n.3 (D. Colo. Jan. 9, 2009).

discrediting Mr. Morrison's opinion are either not legitimate or not borne out by the record, his conclusion in this regard does not constitute substantial evidence.

I might be inclined to consider whether the errors in assessing plaintiff's physical residual functional capacity were harmless, were I not also concerned with similar – but, if anything, more substantial – errors in the ALJ's assessment of the medical opinions as to plaintiff's mental residual functional capacity.  In that regard, the ALJ assigned little weight to the opinion of the consultative examiner, Dr. Immaculate Wesley, who found based on her examination that plaintiff's "abilities as related to basic work activities appear impaired," including specifically memory, sustained concentration, persistence and pace, and social interaction.  She further stated that it was likely that plaintiff had a cognitive disorder of organic origin, but further testing was required to confirm that suspicion.  (Tr. 381.)  She assigned a GAF score of 41 (Tr. 380), indicating "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Lee v. Barnhart*, 117 Fed. Appx. 674, 678 (10th Cir. Dec. 8, 2004) (quoting *Diagnostic and Statistical Manual of Mental Disorders* at 34 (Text Revision 4th ed. 2000) ("**DSM-IV**").[7]

The ALJ gave little weight to this opinion, emphasizing the alleged "limited clinical benefit of the GAF scale" as merely a snapshot of plaintiff's level of functioning at the time of the examination.  (Tr. 34.)  This determination was too facile a rejection of the

---

[7] "The GAF is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'"  *Langley v. Barnhart*, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004) (quoting **DSM-IV** at 32).

potential relevance of the GAF score in this particular instance. Although a low GAF score does not mandate a finding of disability, *see Seymore v. Apfel*, 1997 WL 755386 at *1-2 (10th Cir. Dec. 8, 1997);*Cox v. Apfel*, 2000 WL 1472729 at *9 (D. Kan. Feb. 24, 2000), a "GAF score of fifty or less . . . does suggest an inability to keep a job," *Lee*, 117 Fed. Appx. at 678, and is particularly probative when coupled with a description of how the rating affects a claimant's ability to work, *Eden v. Barnhart*, 2004 WL 2051382 at *2 (10th Cir. Sept. 14, 2004); *Seymore*, 1997 WL 755386 at *2. Here, Dr. Wesley specifically stated that plaintiff's symptoms would impair work-related functions (Tr. 381), and although I agree with the ALJ that the opinion is vague insofar as it does not quantify the extent of plaintiff's work-related impairments, the onus was on the ALJ to recontact Dr. Wesley for further clarification, *see* 20 C.F.R. § 416.927(c)(3); **Social Security Ruling 96-5p**, 1996 WL 374183 at *6 (SSA July 2, 1996).

Instead, the ALJ discredited Dr. Wesley's conclusions as based merely on plaintiff's "self-serving" statements. (Tr. 34.) Of course, the fact that a medical source relies on a plaintiff's subjective reports of her symptoms provides no basis for discrediting a medical opinion. *See Nieto v. Heckler*, 750 F.2d 59, 60-61 (10th Cir. 1984); *Gutierrez v. Astrue*, 2008 WL 5246300 at *4 (D. Colo. Dec. 15, 2008). The ALJ's own disbelief of plaintiff's subjective complaints provides no basis on which to discredit an otherwise valid medical source opinion,[8] since the ALJ may not substitute

---

[8] The ALJ also characterized Dr. Wesley's examination as "isolated." (Tr. 34.) To the extent he intended thereby to discredit her opinion further based on the fact that she had seen plaintiff only once, this reason is illogical given his decision to rely instead on the psychological assessment of the non-examining state agency physician – who merely reviewed the medical record and did not examine plaintiff personally at all – instead. *See Daniel*, 2008 WL 3833761 at *5 (D. Colo. Aug. 13, 2008) ("[D]iscounting a consultative examiner's opinion because it is based on a one-time examination is both illogical, since such is the inherent nature of a consultative examination, and ironic in this instance, given that the opinion to

his lay opinion on the effect of medical findings for that of a medical professional.[9]  **See**

**Hamlin**, 365 F.3d at 1221.  **See also** McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th

Cir. 2002) ("[A]n ALJ may not make speculative inferences from medical reports and

may reject a treating physician's opinion outright only on the basis of contradictory

medical evidence and *not due to his or her own credibility judgments, speculation or lay

opinion.*") (emphasis in original).  That error is compounded here because the reasons

which the ALJ gave for discrediting plaintiff's testimony also are insupportable.

There is little support in the record for the ALJ's conclusion that plaintiff had

exaggerated her symptoms.  (Tr. 34.)  Dr. Wesley expressly found otherwise, noting

that plaintiff was a "reliable" informant (Tr. 377) and concluding that plaintiff's reports of

physical pain were not "intentionally produced or feigned" (Tr. 381).  The statement of

the non-examining state agency consultant, Dr. James Dyde, suggesting that plaintiff

exaggerated her symptoms, on which the ALJ relied, appears unsubstantiated.[10]  Nor

does the letter plaintiff submitted prior to the hearing, to which the ALJ also referred,

clearly substantiate such a conclusion.  (Tr. 327-339.)  The letter begins:

> John Nash: 1994 Nobel Prize

---

which the ALJ ultimately afforded the greatest weight was based on no examination at all.") (footnote omitted).

[9] This same error infected the ALJ's rejection of the opinion of Ms. Diane Fresquez (misidentified in the opinion as "Ms. Sanchez"), LCSW, who examined plaintiff just prior to the hearing in January 2012. (Tr. 400-402.)  Ms. Fresquez reported that plaintiff was hearing voices telling her to kill herself and feeling hopeless, and felt that her current medical management was not controlling her symptoms adequately. She assessed a GAF of 46.  It simply was improper for the ALJ to discredit this report based on his own evaluation of the import of Ms. Fresquez's examination findings.

[10] It is unclear how Dr. Dyde arrived at his conclusion that plaintiff "has exaggerated her current psych. symp based on past more severe symp." (Tr. 98.)  The medical evidence at the time of Dr. Dyde's review consisted almost exclusively of Dr. Wesley's opinion (Tr. 95-96, 98), which as noted herein, did not support a conclusion of malingering or symptom magnification (Tr. 377, 381).

> I am not a genius
> I am not a schizophrenic
> Consider for but a moment is it not possible to be intelligent
> and (mad)?
> ~~4.0 ACS~~
> ~~UCCS~~
> ~~UNM Law School.~~
> BiPolar by definition is a chemical imbalance.
> The greatest minds in the world do not understand all the
> facets of the mind.
> Mental Illness:
> I have been robbed. . . .

(Tr. 327.)[11]  It is hard to fathom how this submission can be adequately summed up by the ALJ's benign characterization as merely "a bit disorganized," let alone how it supports a conclusion that plaintiff was exaggerating the impact of her mental impairments.  (Tr. 34 n.7.)

The ALJ also pointed to plaintiff's report of having "weaned" herself off Prozac and Depakote shortly after meeting with Dr. Wesley.  (Tr. 34, 432.)  The ALJ's apparent inference that plaintiff no longer needed medication to control her bipolar symptoms, however, is unwarranted.  Mr. Morrison explicitly told plaintiff at the time she reported going off her medications "that she does have bipolar disorder, and that she may well need the medications in the future."  (Tr. 432.)[12]  Just as "it is a questionable practice to chastise one with a mental impairment for the exercise of poor

---

[11] Elsewhere, plaintiff purports to quote at length the screenwriter of "A Beautiful Mind," a movie which she said "comes close to what I am attempting to explain." (Tr. 338.)  She ended the letter with the phrase "Journey Into Chaos" above her signature.  (Tr. 339.)

[12] Indeed, it appeared that plaintiff had gone off Prozac at least once previously in July 2009, at which time Mr. Morrison "had a long discussion about anxiety/depression, chronic bipolar" and plaintiff agreed to continue taking Prozac. (Tr. 370.)  In addition, statements plaintiff made to Dr. Wesley demonstrate that this was a long-standing pattern. (Tr. 378 ("'They would prescribe, I would feel better then I'd stop the meds thinking I was better.  I'd get depressed again[.]' . . . .This cycling back and forth went on for 15 or 20 years.").)

judgment in seeking rehabilitation," ***Gutierrez***, 2008 WL 5246300 at *4 n.4 (citation and internal quotation marks omitted), it appears unreasonable to this court to permit an ALJ to draw negative inferences from the treatment decisions of a claimant with a confirmed mental illness, at least where those decisions are both self-directed and apparently contrary to medical advice.

Moreover, the Commissioner's regulations explicitly recognize that the level of functioning for a claimant who suffers from mental impairments "may vary considerably over time." 20 C.F.R. Pt. 404, Subpt. P, app. 1, § 12.00D(2). ***See also Daniel v. Astrue***, 2008 WL 3833761 at *4 (D. Colo. Aug. 13, 2008). Thus, the ALJ's suggestion that plaintiff was not credible because of her allegedly inconsistent treatment history and the supposed "positive management of her symptoms with medication" does not bear up on closer examination. (Tr. 34.) Although it does appear that plaintiff's mental health treatment history was somewhat peripatetic, it is difficult to characterize it as efficacious. Plaintiff reported a 15- to 20-year history of efforts to control her mental health symptoms, noting that after being prescribed medications, "I would feel better then I'd stop the meds thinking I was better. I'd get depressed again[.]" (Tr. 378.)

The medical evidence seems to bear out this pattern as well. For example, in February 2011, just five months after going off Prozac, plaintiff agreed to start again because she was having mood swings again. (Tr. 425.) Nevertheless, by September, plaintiff reported hearing voices telling her to kill herself, and was immediately referred to Spanish Peaks Mental Health Center. (Tr. 422.) It appears that plaintiff did participate in therapy "on a regular basis" for a time, but stopped because of her

involvement as a plaintiff in a class action lawsuit in Denver.  (Tr. 403.)[13]  Although the ALJ noted that plaintiff stopped therapy at that time (Tr. 34), he failed to note that she resumed treatment in January 2012, at which time she reported an increased frequency of panic attacks and that she was hearing voices, and stated that was "the worse she has been in a while" and that her medications were not working.  (Tr. 400-402.)   The ALJ's failure to acknowledge the cyclical pattern of plaintiff's symptoms suggests some level of "cherry picking" the record, which is improper.  *See Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004).

The ALJ also relied on plaintiff's activities of daily living, specifically that she attended church and held a part-time job, as a basis for discrediting her subjective complaints.  (Tr. 34.)  In general, activities of daily living do not translate well into a determination of what the claimant can do on a sustained basis in the workplace. *Thompson*, 987 F.2d at 1490.  Particularly here, where these two activities comprised the *entirety* of plaintiff's reported regular activities outside the home (Tr. 73), it is difficult to draw a broader inference about her credibility therefrom.  Moreover, it appears that plaintiff does not attend church regularly (Tr. 73), and the submissions of her manager and the owner of the small video store where she works part-time suggest that her employer is highly accommodating of her impairments (*see* Tr. 319,

---

[13]  Although there are no mental health records from this period in evidence, it is the ALJ's duty to ensure that the record is adequately developed.  *See Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996).  *See also Dennis v. Astrue*, 2012 WL 882408 at *3 (D. Colo. March 14, 2012) (citing *Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997) (ALJ "must use reasonable good judgment to ensure that the record fairly addresses the material issues").

320).[14]  The Commissioner has specifically recognized that activities a claimant is able to perform only in a highly structured and supportive environment are not particularly compelling evidence of the ability to sustain employment in other, more competitive, contexts.  *See* 20 C.F.R., Pt. 404, Subpt. P, app. 1, § 12.00F.  The ALJ's failure to address these circumstances undermines his conclusion that plaintiff's part-time work detracted from the credibility of the limitations she claimed.

Thus, although "credibility determinations 'are peculiarly the province of the finder of fact,' and should not be upset if supported by substantial evidence," **White v. Barnhart**, 287 F.3d 903, 909 (10th Cir. 2001), the ALJ's findings here are not so supported.  Remand is therefore required.  Although plaintiff intimates that a directed award of benefits may be appropriate here, I find that this case does not present a proper occasion for the exercise of my discretion in that regard.[15]  *See Nielson v. Sullivan*, 992 F.2d 1118, 1122 (10th Cir. 1993).

## IV.  ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1. That the conclusion of the Commissioner through the Administrative Law Judge that plaintiff was not disabled is **REVERSED**;

2. That this case is **REMANDED** to the ALJ, who is directed to:

---

[14] For example, plaintiff's employer accommodates her despite the fact that she is absent an average of 3 to 5 days a month due to her physical and mental impairments. (Tr. 319.)  The vocational expert testified that missing only two days of work per month would not tolerated in the competitive workplace.  (Tr. 83.)

[15] By this decision, I do not find or imply that plaintiff is or should be found to be disabled.

      a.  Reevaluate the medical opinions of record in light of the court's order herein, making specific findings regarding the weight assigned to each such opinion and the reasons therefor;

      b.  Recontact any medical or other source, seek the testimony of medical or vocational experts, order further consultative examinations, or otherwise further develop the record as he deems necessary;

      c.  Reassess the credibility of plaintiff's complaints, giving specific reasons tied to the evidence of record for his determination in that regard;

      d.  Reevaluate his opinions at steps 4 and 5 of the sequential evaluation; and

      e.  Reassess the disability determination; and

3.  That plaintiff is **AWARDED** her costs, to be taxed by the clerk of the court pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1 and 28 U.S.C. § 2412(a)(1).

Dated September 22, 2014, at Denver, Colorado.

**BY THE COURT:**

*/s/ Bob Blackburn*
Robert E. Blackburn
United States District Judge